149 P.3d 813

Anthony J. FERRO, an individual,
Plaintiff–Appellant–Cross
Respondent,

v.

The SOCIETY OF SAINT PIUS X, a
priestly society maintaining it headquar-
ters in Switzerland, The Society of Saint
Pius X, Kansas City, Missouri, Inc., a
foreign corporation maintaining its
headquarters in Kansas City, Missouri,
Immaculate Conception Chapel of the
Society of St. Pius. X., Inc., an Idaho
corporation, Defendants–Respondents,

and

Father James H. Doran, individually,
Defendant–Respondent–Cross
Appellant.

No. 31807.

Supreme Court of Idaho,
Moscow, September 2006 Term.

Sept. 29, 2006.

Rehearing Denied Jan. 12, 2007.

Evans Keane LLP, Boise, for appellant. Jed W. Manwaring argued.

Paine Hamblen Coffin Brooke & Miller, Coeur d'Alene, for respondents. Patrick E. Miller argued.

EISMANN, Justice.

This is an appeal from a judgment awarding a parishioner damages for the intentional infliction of emotional distress because of a priest's conduct. The statute of limitations had run before the lawsuit was filed, but the jury found that the defendants were equitably estopped from asserting it as a defense. Because the plaintiff did not proceed with due diligence once he knew or reasonably should have known that the alleged misrepresentations supporting the equitable estoppel were untrue, we reverse the judgment.

## I. FACTS AND PROCEDURAL HISTORY

The plaintiff-appellant Anthony Ferro (Ferro) was a parishioner at Immaculate Conception Chapel of the Society of Saint Pius X, Inc., (Chapel) located in Post Falls, Idaho. The Society of Saint Pius X (SSPX) is a priestly society that was founded in 1969 by Roman Catholic Archbishop Marcel Lefebve, who believed that the Roman Catholic Church was not holding fast to its traditions, particularly with respect to how to celebrate the Holy Mass. SSPX is headquartered in Switzerland and is headed by a Superior General, but still professes filial devotion and loyalty to the Roman Catholic Pope.

On August 26, 1992, Father James Doran arrived at the Chapel to be the parish priest. Four years later he was removed and transferred to a seminary in Minnesota. While he was the parish priest, Father Doran engaged in conduct that ultimately led to this lawsuit.

Ferro's wife, Patricia, had obtained a default divorce in October 1992. Ferro did not recognize the divorce and sought Father Doran's assistance in resolving their marital difficulties. In June 1993, Patricia gave birth to their child. She had not disclosed her pregnancy during the divorce proceedings, and therefore the decree did not address the custody of the child. Legal proceedings to determine child custody and support were instituted some months later.

After meeting with Ferro and Patricia, Father Doran sent them a letter dated December 3, 1993, outlining five things they were to do in an attempt to resolve their difficulties. One of the recommendations was that Ferro obtain a psychological evaluation. Ferro complied by being examined by a psychiatrist in the United Kingdom. The psychiatrist sent Father Doran a letter dated December 20, 1993, in which the psychiatrist stated that Ferro was not suffering from any mental illness. Father Doran soon concluded that the difficulties between Ferro and Patricia were irreconcilable. On December 24, 1993, he sent them a strongly worded letter chastising them for their actions. He also sent copies of the letter to eighteen other people. In the letter, Father Doran stated that the English psychiatrist's "psychological opinion ... judging complete stability in a case where the patient has exhibited no perseverance in any previous activity is beyond belief." Ferro contended that Father Doran's criticism of the psychiatrist's opinion constituted an implied assertion that Ferro was mentally ill.

In early 1995, Ferro asked Father Doran to withdraw the letter, but Father Doran refused to do so. On April 19, 1995, at Ferro's request, Father Doran wrote another letter addressed "To Whom It May Concern." In that letter he was very critical of Patricia and commendatory of Ferro. Father Doran stated, "This last year has witnessed a complete change in the behavior of Mr. Ferro; equally so on the part of Mrs. Patricia Ferro. The last ten months have shown Anthony to be much more balanced and easy going, except for the constant strain of not seeing his daughter." Father Doran wrote that in the beginning he did not believe Ferro, but now he did; that Patricia has become seemingly unstable and vindictive in her behavior; that when Ferro and Patricia were together, the situation was unbearable; that Ferro's past erratic behavior was the result of living in a continued state of exasperation with Patricia's conduct; that Ferro

continues to persevere; and that his presence in the parish is a positive one. Ferro was not satisfied with this letter because he believed that the statement regarding the changes in him during the last ten months indicated that the allegations about his earlier conduct were accurate.

On March 6, 1996, Father Doran mentioned Ferro from the pulpit. Although Ferro was downstairs at the time and did not hear Father Doran's comments, two men came to him after the comments and told him that Father Doran had shamed him. Ferro went immediately to talk with Father Doran after the service was completed, but Father Doran refused to talk with him. Father Doran was removed as parish priest in August 1996.

On August 11, 2003, Ferro filed this action against SSPX; its United States District headquartered in Kansas City, Missouri (SSPX–Missouri); the Chapel; and Father Doran, seeking to recover damages under various theories. All claims except one for intentional infliction of emotional distress were ultimately dismissed. That claim was tried to a jury, who returned a verdict in Ferro's favor, awarding him $200,000 in compensatory damages and $600,000 in punitive damages. The jury also found that the Chapel, SSPX–Missouri, and SSPX had ratified Father Doran's conduct, and that all defendants were equitably estopped from asserting the statute of limitations as a defense. The district court entered a judgment against all defendants, jointly and severally, in the sum of $800,000.

Following the jury verdict, the defendants moved for a judgment n.o.v. or, in the alternative, a new trial or remittitur. The district court granted the motion for a judgment n.o.v. in part. It held that there was no substantial evidence supporting the jury's finding that SSPX, SSPX–Missouri, and the Chapel had ratified Father Doran's conduct towards Ferro. The court also granted a new trial on the issue of ratification in the event the judgment n.o.v. is not upheld. Finally, the court found that the $600,000 award of punitive damages was influenced by passion or prejudice and ordered a new trial on the issue of punitive damages unless Ferro accepted a reduction in punitive damages to the sum of $200,000. The court entered an amended judgment awarding Ferro $200,000 in compensatory damages and $200,000 in punitive damages against Father Doran and dismissing the claims against SSPX, SSPX–Missouri, and the Chapel. Ferro appealed, and the defendants cross-appealed.

## II. ANALYSIS

■ The dispositive issue is whether Ferro's cause of action was barred by the statute of limitations. His claim was based upon Father Doran's conduct while he was parish priest. Because Father Doran was removed as parish priest in August 1996 and Ferro did not file this lawsuit until August 11, 2003, the defendants contended that it was barred by the two-year statute of limitations. Ferro claimed, and the jury found, that the defendants were equitably estopped from asserting the statute of limitations as a defense. On appeal, the defendants contend that the jury's verdict is not supported by substantial and competent evidence.

■ "The only non-statutory bar to a statute of limitation defense in Idaho is the doctrine of equitable estoppel." *J.R. Simplot Co. v. Chemetics Int'l, Inc.,* 126 Idaho 532, 534, 887 P.2d 1039, 1041 (1994). In the *Chemetics* case, we listed the elements of equitable estoppel as follows:

(1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth; (2) that the party asserting estoppel did not know or could not discover the truth; (3) that the false representation or concealment was made with the intent that it be relied upon; and (4) that the person to whom the representation was made, or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice.

■ Equitable estoppel does not eliminate, toll, or extend the statute of limitations. *J.R. Simplot Co. v. Chemetics Int'l, Inc.,* 126 Idaho 532, 887 P.2d 1039 (1994). It merely bars a party from asserting the statute of limitations as a defense. That bar does not last forever, however. It lasts only for a reasonable time after the party asserting

estoppel discovers or reasonably could have discovered the truth. *Knudsen v. Agee,* 128 Idaho 776, 918 P.2d 1221 (1996) (estoppel did not bar defendants from relying upon the statute of limitations where plaintiff learned of an allegedly concealed fact within adequate time to bring a lawsuit prior to the running of the statute of limitations); *Anderson v. Anderson, Kaufman, Ringert and Clark, Chartered,* 116 Idaho 359, 775 P.2d 1201 (1989) (estoppel barred plaintiff from relying upon the statute of limitations as a defense to a counterclaim filed after the statute of limitations had run where counterclaimants acted with due diligence in bringing claim once concealment of material fact was discovered). Once the party claiming estoppel discovers the truth with respect to the alleged misrepresentations upon which the estoppel is based, that party must act with due diligence in asserting the claim.

In this case, the district court instructed the jury on the elements of estoppel insofar as it applied to the Defendants' statute-of-limitations defense. It did not instruct the jury as to how long estoppel would bar such defense. It simply instructed the jury that if the elements of equitable estoppel had been proven, "you must not consider the Defendants' defense of the statute of limitations." Although the Defendants have not challenged that instruction, they have asserted that there is not substantial evidence supporting the application of equitable estoppel as a bar to their statute-of-limitations defense.

Because the resolution of this issue turns upon whether Ferro brought this action within a reasonable time after he learned that the representations made were not true, we do not address several other issues raised by the Defendants. The claim of equitable estoppel is based upon statements made by persons other than Father Doran. The Defendants argue that there is no showing that those persons had authority to represent Father Doran at the time. We do not address the issue of what Defendants, if any, those people had authority to represent at the time they made the statements. Likewise, we do not address the issue of whether the statements constituted a misrepresentation of fact upon which estoppel could be based rather than merely an expression of opinion.

Ferro's claim for intentional infliction of emotional distress was based upon the conduct of Father Doran while he was parish priest during the period from August 1992 through August 1996. Father Doran did not make any misrepresentations to Ferro relevant to the claim of equitable estoppel. The evidence was undisputed that after Father Doran was removed as parish priest in August 1996, he did not make any representations to Ferro.

In December 1995, Ferro talked in Post Falls with Father Schmidberger, who was the Assistant to the Superior General and therefore the second-in-command of SSPX. Ferro testified as follows regarding their conversation.

> Q Okay. What did Father Schmidberger tell you that you relied upon?
>
> A In absolute words I will tell you what he said, because I remember it very well. He said, he says Mr. Ferro, he says do not worry, he says. He says, we are going to deal with Father Doran immediately. He did not say that we are going to dismiss him. He said we are going to deal with him immediately and you will be happy with the decision. He also asked me before that about whether I was going to live there. And then he proceeded with that statement when I said yes, of course. And he said naturally I expected you to answer that way. Those were his words.

Father Schmidberger merely stated that they would "deal with Father Doran immediately." Father Doran was removed as parish priest in August 1996. If Father Schmidberger's statement constituted a false representation because August 1996 was not immediate, Ferro knew of it in August 1996. It would not be a misrepresentation he relied upon in failing to file this lawsuit before the expiration of the statute of limitations.

After Father Doran's sermon in March 1996, Ferro talked with Father Scott, the District Superior of the United States. Ferro's testimony regarding what Father Scott told him was as follows:

> Q And what did he [Father Scott] say that you relied upon in not filing a lawsuit?
>
> A He told me they would deal with it. That is basically what he said, that I did

not need to file a lawsuit and that I—and that they would deal with it, and he was bringing in someone very special that he thought I would get along with and would fix the whole situation.

Father Scott simply stated he would "deal with it" and would bring in someone he thought Ferro would get along with who could fix the situation. In August 1996, Father Boyle was brought in to replace Father Doran. Even if that did not constitute dealing with the situation, and even if Father Boyle was unable to "fix the whole situation," Ferro would have known that by August 1998 when Father Boyle was removed as parish priest.

While he was parish priest, Father Boyle made several statements to Ferro seeking to dissuade him from filing a lawsuit. With respect to Father Boyle's statements, Ferro testified as follows:

Q   Okay. Ultimately he [Father Boyle] met with you and a lawyer, did you say?

A   Correct.

Q   Approximately what time was that?

A   That was February '98.

Q   Okay. From the beginning did he start making representations to you about what you should or should not do?

A   Yes.

Q   What were those representations?

A   He says firstly, he told me obviously that he was always available, particularly in an exceptional way. He wanted to know precisely what happened, whether I—what people said or anything like that. He told me that—one of the main things he told me was that I should not sue the society. He says you don't need to sue the society. By [My] statutes of limitations were—

MR. MILLER: Objection, your Honor.

MR. MANWARING: If you hear an objection, stop.

MR. MILLER: Asking for a legal conclusion at this point in time.

MR. MANWARING: Let me rephrase, your Honor.

THE COURT: All right. The answer can stand to the degree that it was stated, and we can go to the next question.

Q   BY MR. MANWARING: Do you understand the idea that if someone has been damaged there may be certain time limits that you have to do something legally if you are going to pursue that?

A   Correct.

Q   And did you discuss that idea with Father Boyle?

A   Yes, sir.

Q   And what did he tell you about that subject?

A   He just told me[, "W]hat are the statutes of limitations[?"] And I said in Idaho it is two years.

Q   Okay. What did he tell you as a result of whether you should sue or not?

A   He says—he says—first of all, he implied that it is wrong to sue and that there was no need, is basically what he conveyed, because he was very confident that he was going to turn the situation around for me. And that they would meet, you know, any damages, early damages and that sort of thing.

Q   So, did you sue?

A   I did not sue, no.

Q   Why did you not sue?

A   Well, that may seem odd, but priests are priests. And you know, particularly I was brought up, you know, by army Benedictine monks. You don't you know, you respect—you trust them. You always believe that they are good to being with until proven otherwise.

Q   Did you rely on those representations that he made to you?

A   Yes, completely.

MR. MILLER: Objection, leading, your Honor.

THE COURT: It is somewhat leading, but it is also foundational. I will overrule the objection.

Q   BY MR. MANWARING: Was Father Boyle successful in his efforts to rehabilitate your reputation?

A   He was largely successful, I would say.

[Q]   Fully successful[?]

[A]   He was largely successful.

In February 1998, Ferro knew that there was a two-year statute of limitations with respect to any lawsuit he would file. He and his attorney met with Father Boyle. Father

Boyle stated that Ferro did not need to sue, that he was confident he could turn the situation at the parish around for Ferro, and that "they would meet, you know, any damages, early damages and that sort of thing."

After Father Boyle was removed as parish priest, Ferro sent a four-page demand letter dated November 19, 1998, to Bishop Fellay, the Superior General of SSPX. In that letter, Ferro stated that during the last year he had sent two prior letters to Bishop Fellay. Ferro noted that Bishop Fellay's response to the first letter had been to accuse Ferro of setting priest against priest and that Bishop Fellay had not responded to the second letter.

In his demand letter, Ferro recounted much of what had happened and explained in detail the injustice he had suffered. He chastised Bishop Fellay for removing Father Boyle and Father Pazat from Post Falls and for not following their advice. Ferro wrote:

> You commissioned two very good and manly priests to deal with a nest of vipers. When they uncovered the demon and loyally proposed to their superior how it should be vanquished, you proceeded against their advice and their detailed observations by breaking the tenuous apostolic chain of command, and listening to, Bishop Williamson, a non-jurisdictional Bishop who is influenced by a priest who cut down five excellent priests in a period of 3½ years in Post Falls.
>
> . . . .
>
> My tone is not angry but one that is incensed by what I have witnessed. Your complete lack of accountability, after so much unnecessary suffering has been reported to you, is absolutely atrocious. . . . Fr. Boyle and Fr. Pazat had excellent control of the situation. They are the only fully qualified priests, that can deal with the enormous undertaking at Post Falls, that I have met in the last nine years.

Ferro demanded three things from Bishop Fellay. First, he demanded that the Bishop write an authoritative letter addressed to Ferro's uncle denouncing Father Doran's lies.

> For the last time, what is needed is a letter, addressed to my uncle, of firm authority from you denouncing Fr. Doran's lies and his public campaign in the parish against me. Along with this I want you to enclose a letter of explanation from Fr. Boyle who spent two years here and knows the entire story. I also want a copy of your authoritative letter. . . . .
>
> . . . .
>
> The authoritative letter must recant the lies and dishonorable accusations made against Anna Marie's father [Ferro] whether in the 1993 letter or at Fr. Doran's outburst from the pulpit in March 1996. My uncle is a career military man and will only be influenced by firm authority. To do as I ask you is simply exercising natural justice by reversing the effects of the abuse of authority. . . . .

Second, Ferro demanded that Bishop Fellay publicly punish Father Doran and Bishop Williamson, who had sided with Father Doran, by transferring them out of the United States. He wrote, "I now want you, since the inference in this community gets worse by the day, to discipline Bishop Williamson and Fr. Doran. The discipline has to be made visible by taking them away from their present positions and America."

Third, Ferro demanded compensation, although he did not specify an amount.

> All expenses caused by the lengthy dysfunction imposed upon my daily life for nearly five years must be realized by the Society. This is a particularly just request because of the lengthy suspicion I was put under before the civil courts. What a malicious order for Fr. Doran to publicly order me to court, and at the same time, label me as mentally ill which nearly made it impossible for Anna Marie to have a father.

Ferro insisted upon a fast response to this letter, stating, "I have no choice any longer but to go elsewhere if you still refuse to deal with such erroneous behavior by your priests and nuns. I want a fast response to this letter either way you decide." He also concluded the letter with an ultimatum, "I ask you now to handle it internally or I will go to outside sources." Bishop Fellay did not respond to Ferro's demand letter.

**544**

Father Boyle's statement that he was confident the Society would "meet any damages" that Ferro had was a statement about a future event. Generally, a statement about a future event does not constitute a misrepresentation. *Maroun v. Wyreless Systems, Inc.*, 141 Idaho 604, 114 P.3d 974 (2005). A misrepresentation must be as to a past or existing fact. *Id.* A statement that an act will occur is actionable if it is proven that the speaker made the promise without intending to keep it. *Id.*

Assuming Father Boyle's statements as to how Bishop Fellay would respond to the situation could constitute a misrepresentation, Ferro knew that Father Boyle's optimistic predictions were unfounded within a reasonable time after he had sent the demand letter. As Ferro noted in his demand letter, Bishop Fellay's response to Ferro's two prior letters was negative. In response to the first one, he accused Ferro of setting priest against priest, and his response to the second was to ignore it. Although Ferro insisted upon a "fast response" to his demand letter, Bishop Fellay did not respond at all. The only reasonable interpretation of Bishop Fellay's conduct was that he was not willing to accede to Ferro's demands.

Ferro testified that he had telephone conversations with Father Boyle after sending the demand letter, and that Father Boyle opined that Bishop Fellay would eventually answer the letter. Father Boyle's prediction would not justify waiting indefinitely, and Ferro did not. After over a year had passed with no answer, Ferro consulted with several different attorneys, asking them whether he had a strong case and/or whether they would take his case. He did not retain any of them. Three years later Ferro retained an attorney and filed this lawsuit on August 11, 2003. The only reasonable construction of these circumstances is that once Ferro knew or reasonably should have known that the alleged misrepresentations were untrue, he did not proceed with due diligence in filing this lawsuit. Therefore, equitable estoppel no longer prevented the Defendants from asserting the statute of limitations as a defense. Since this lawsuit was not filed timely, it was barred by the statute of limitations, and the Defendants are entitled to have it dismissed with prejudice.

## III. CONCLUSION

We reverse the judgment and remand this case for further proceedings that are consistent with this opinion. We award costs on appeal to the respondents.

Chief Justice SCHROEDER, and Justices TROUT, BURDICK and JONES concur.